Wilma V. ADAMS & Leonard E. Adams *v.* Jerry ATKINS, Robert P. Vickers, & Gloria Vickers

CA 06-466                                                      249 S.W.3d 166

Court of Appeals of Arkansas
Opinion delivered February 7, 2007

*Stanley Law Firm, P.A.*, by: *James W. Stanley, Jr.*, for appellants.

*Woolsey & Wilson*, by: *Bruce R. Wilson*, for appellees.

DAVID M. GLOVER, Judge. Wilma and Leonard Adams appeal the Johnson County Circuit Court's determination of the boundary line between their property and the properties of appellees, Jerry Atkins and Gloria and Robert Vickers. The appellees cross-appeal, arguing that the trial court erred in denying their motion for attorney's fees pursuant to Arkansas Code Annotated section 16-22-309 (Repl. 1999). We affirm on direct appeal and reverse and remand on cross-appeal.

Appellants own land that is adjacent to lands owned by the appellees. Appellants' land is west of appellees' lands; appellees Vickerses land is north of appellee Atkins's land. A road known as

Low Gap Road separates appellees' lands in an east-west direction, and then turns in a southerly direction and runs between appellants' land and appellee Atkins's land. Appellees filed a complaint against appellants after appellant Leonard Adams erected a fence that appellees claimed was on their properties. After a hearing, the trial court determined that the boundary lines submitted by appellees and referred to in the Higby survey were the correct boundary lines between the parties' respective properties. In that same order, the trial court also denied appellees' motion for attorney's fees. All parties appealed.

Appellant Leonard Adams offered convoluted testimony at the hearing. Adams testified that his 160-acre tract was adjacent to and west of appellees' properties. He said that Low Gap Road separated appellees' properties and then turned south, that there was a fence on the east side of that road, and that he had a barbed-wire fence on the west side of the road. He said that the line in question before the trial court was between his east line and appellees' west lines. Adams said that he acquired his land in 1956 and had lived on it since that time, and that he knew that the Vickers had purchased their property around June 1973 but did not know when Atkins had purchased his property, although he knew that it was after he had purchased his land.

Regarding the common boundary line, Adams said that he helped survey his property lines three different times, the first time being in 1944. Adams testified that the Kings had the property surveyed in 1944 and established the boundary of his property further east from where he ultimately put the fence. Adams said that the boundary line had not moved; that it was always there. Adams said that Mr. Jim Woods did a survey in 1983-84 and that he accompanied Woods when that survey was performed, but he did not help him do that survey. Adams also said that a survey was performed in 1948 that involved the same lines that were later surveyed by Mr. Woods. Adams further testified that he assisted Mr. J.M. Tate with a survey in 1950 and the survey established the line where Adams believed it to be. According to Adams, the line was exactly where Jim Woods placed it when he performed his survey. Adams said that the line surveyed in 1944, 1948, and 1950 was in the same location, and he said that in relation to the fence that he erected in 2003, the survey line "ran at an angle that came to the northeast corner of the property, and the fence went south

in front of the survey line towards the east and the survey line went straight." Adams contended that the above survey line was east of the fence that he erected.

Adams testified that he contacted Mr. James Higby to perform a survey in 2003, that the survey was never made by Mr. Higby, and that the survey was cancelled; however, Adams also admitted that Higby sent him the survey. A copy of the "Survey For Leonard Adams by James Higby" is contained in the appellees' addendum to their brief. Adams, again avowing that the survey was never made, said that Higby wanted to make the county road the property line. Adams testified that Higby set a piece of rebar in the middle of the county road and that Higby's survey set the boundary line down the middle of the county road. Adams testified that he put up the fence after Higby had been out there; that he put the fence up thirty or forty feet over from the road; and that at the same time he also put up a fence back to the north on the boundary line between the Vickers's property and his property. Adams stated that even though he had owned his property since 1956, he did not put up a fence until 2003. He stated that there had been previous fences there before he erected his fence, and that the line Higby established was well to the west of where he claimed the fence to be, although he again reiterated that Higby did not make a survey. Adams said that when he put up his fence in 2003 it was west of the survey line and that the fence line was "not real close" to Atkins's west line.

Regarding his south corner adjacent to the Vickerses, Adams said that when he purchased his property, there was a corner rock about six inches square that had remained on the property until Mr. Tate, the Vickerses' predecessor in title, bought the property and moved it. Adams said that the corner marker was moved over onto his driveway eighty-one feet west of where it had been, and that it remained there until the gas line was placed there. Adams said that when the main gas line was placed, he advised the gas company's engineer surveyor as to where the corners were and showed him the aluminum pipe with a cap on it that had been set by Woods when he performed the survey.

James Higby testified that he was the county surveyor and was also a self-employed surveyor. He said that Adams requested that he run a line between two existing monuments. Higby said that Adams told him that both of the corners had been clearly marked and he could walk him to each of the corners. Higby said that he was unable to find the corners that day, so he could not do

anything at that time. He said that Adams stopped his employees while they were shooting the lines because Adams did not like the location. Higby testified that he marked the north half of the line with orange flags and marked the line all the way from the corner he established all the way to the four surface corners at Adams's northeast corner, and that that was the extent of his work. Higby said that he was able to locate the two corners and tried to shoot the line between them. He also said that he did some research at the Forest Service Office and checked out the plat that had been surveyed by James Woods, as well as the monuments and the reference distances. He said that the Forest Service corner cards and the plat checked out correctly, and that he found the monuments that had Mr. Woods's license and registration number stamped on the cap. Higby testified that he believed the line was where it had always been. He said that the two corners he found on the monuments were already the southeast corner of Atkins's property and the northwest corner of the Vickerses' property and that those points were correct. Higby said that the line ran from the southeast corner of Adams's property to the northeast corner of Adams's property.

Higby said that Adams never pointed out any corners established by Mr. Woods, and that Adams did not show him a car axle driven into the ground near the county road. Higby said that after Adams maintained that he did not perform the survey correctly, he took his plat and compared it to all of the azimuths and distances that were on the plat Adams had, which was the Forest Service plat prepared by Jim Woods. Higby testified it "all checked out real good," and that his line was consistent with the line shown on the Forest Service plat. Higby further testified that, after Adams said that his survey was not accurate, he met with Adams because he wanted to show Adams that his survey was the same as the one Adams had. Higby said that the dotted lines on the Woods' instrument indicated a reference point, not the property line, which was indicated by the solid line. Higby testified that Adams erected the fence after Higby had gone out to the property. Higby also stated that there were no markers between the southeast corner and the northeast corner of Adams's property. He reiterated specifically that Adams had never said anything to him about an axle. Higby's testimony concluded with the statement that the east line shown on the Woods' survey was the same line depicted on his survey.

Appellee Robert Vickers testified that he obtained his property around June 1973 and that Adams owned his property prior to that time. Vickers said that the northwest corner of his property was set by the United States Forest Service, and that it was a two-and-a-half foot high rock. Vickers said that there was also a mark on the southwest corner on a large cherry tree, and there was an old fence running down the side of the road to the corner. Vickers said that when the gas line came in and a gas line right-of-way was established, the southwest corner of his property was pushed out and that two posts were set with blue paint on top of them. He testified that Adams had had a fence tied from post-to-post for years. Vickers said that was the marking of the boundary line; that it was just east of the road about three or four feet; and that it would have been west of the Higby line about seventeen feet on the south and about ten feet on the northwest side. Vickers said that if they went by the Higby survey, he would be giving up about an average of a fifteen-foot strip on his east side and that it was cutting into his deed line.

Vickers said that Adams put up a fence that went across the gas line right-of-way about fifty or sixty feet going north from the road and west of the Higby line that was "pretty well where the John Harbison and Roy Tate line was established in the 40s and 50s." Vickers said that Adams came to him to tell Vickers that he had contacted James Higby to come out and establish the property boundaries between the Adamses', the Vickerses', and Atkins's properties. Vickers said he told Adams that was good and that a survey would stand up in court. Vickers said that, when Higby completed the survey, Higby made Vickers aware of the line established between Vickers and Adams. Vickers testified that the property line ran right up the ditch line parallel to the Atkins's fence, which would be just west of Low Gap Road after it turned south and west of Atkins's fence along the ditch line, approximately six feet. Vickers said that either on February 29, 2004, or the morning after, he noticed a line of fence posts running across Atkins's field. Vickers said that his dogs had "raised cane" that night for two or three hours. Vickers said that the fence was constructed at the southern boundary of his property, starting where the old fence was located, and that it fenced up the east side of Low Gap Road, approximately fifty to sixty feet and then turned back north across his property for one hundred feet. Vickers said that Adams later completed the fence and that the fence ended up at his northwest corner where Jim Woods and Bill Lane established

the corner. Vickers testified that the fence was forty to fifty feet east of where the boundary line should be.

Vickers said that the Forest Service had a "traveler's point" just south of the Adamses' right-of-way. Vickers testified that he and Adams measured from the traveler's point where the line would be, and it came within a foot of where Higby had run the line. Vickers said that the fence Adams constructed gradually fed over onto his property and that when it got to the south side of the Adamses' property, it was more than forty to fifty feet onto the Vickerses' property that was under the Adamses' fence. Vickers said that the fence Adams put up was approximately seventeen or eighteen feet from where Higby had established the line. Vickers said that he accepted the Higby line, and he agreed that according to the Higby line his line was twenty-two feet east of the private roadway off Low Gap Road.

Appellee Jerry Atkins testified that he purchased his property in 1994; that at that time, it was fenced; and that the fencing was still the same fencing that was there when he purchased the property. Atkins said that, as far as he knew, the fence has always been in the same place, except that a locust post was moved on the corner of the road so that the bus could get around the corner. Atkins said that Adams had never made any use of the property. He testified that Adams had put his fence up in 2004.

Harold Humerickhouse testified that he had been employed by the United States Forest Service as a boundary manager and that he was familiar with the property involved in the boundary dispute. He said that he found all of the original corners in place that were set by the Forest Service in 1982 and 1984, and that they had not been moved. He said that in relationship to the property owned by the Adamses, corner H-16 was in the general vicinity of the southeast corner of the Adamses' 160 acres and the F-16 marker was at the northeast corner. Humerickhouse said that the records from the Forest Service for corner H-16 showed "north nineteen and a half west, twenty-four point nine feet, a twenty-two inch red oak snag with the Forest Service bearing tree tag; number two at the south fifty-three and a half east fifteen point two feet the six inch maple tree," with the tags on all of the trees; that the corner monument was in place; and that "everything checked out."

Humerickhouse said that, at his request, Higby was with him when he went to the property; he had hired Higby so that he could testify that it was the same corner that Higby had used in the

survey. He said that he took Higby to each of the corners to make sure that they were exactly the same and had not been moved. He testified that the northeast corner and the southeast corner were connected by solid lines. He said that the drawing showed two things — the dotted line depicted Adams's claim and the solid line depicted the actual position of the corners when the section was properly divided per the survey. Humerickhouse explained that the survey did not give Adams more land, it just described where his line was located and that there was property he was not using to the east and to the west. He testified that the Woods and the Higby surveys established the line consistently.

After Humerickhouse's testimony, Adams testified again, stating that he never told Jim Woods that his line was what he had depicted by the dotted line. Though Adams agreed that the line should be the solid line, he stated that he did not believe that the corners were exactly set in place. Adams confirmed that the northeast corner was located where Humerickhouse located it, but he asserted that the southeast corner had been moved and that the corner marker could not be found. Adams reiterated that it was his position that the corners shown had been moved, at least the southeast corner. He again said that the northeast corner was okay, but then he said that the northeast corner had been moved to the west. Adams concluded by testifying that he erected the fence so that he could determine where the property line was located.

Although equity cases are reviewed de novo on appeal, a trial court's finding of fact concerning the location of a boundary line will not be reversed unless it is clearly erroneous, meaning that although there may be evidence to support the finding of fact, the court is left with the definite and firm conviction that a mistake has been committed. *Hattabaugh v. Housley*, 93 Ark. App. 167, 217 S.W.3d 132 (2005) (citing *Hedger Bros. Cement & Material, Inc. v. Stump*, 69 Ark. App. 219, 10 S.W.3d 926 (2000)).

Higby's survey was not at odds with the Forest Service survey — in fact, it was completely consistent with the Forest Service survey. No other survey was presented that refuted either the Higby or the Forest Service survey. Humerickhouse's testimony corroborated both surveys. The only evidence that conflicted with the surveys was Adams's testimony, in which he asserted that at least one of the corners, and maybe both of them, had been moved. This court defers to the trial court's assessment of the credibility of witnesses, and it is apparent that the trial court

found the survey evidence to be more credible. We affirm the trial court's finding with regard to the boundary line, as its finding was not clearly erroneous.

On cross-appeal, appellees/cross-appellants argue that the trial court erred in denying their motion for attorney's fees pursuant to Arkansas Code Annotated section 16-22-309 (Repl. 1999). Subsection (a)(1) provides:

> In any civil action in which the court having jurisdiction finds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party or his attorney, the court shall award an attorney's fee in an amount not to exceed five thousand dollars ($5,000), or ten percent (10%) of the amount in controversy, whichever is less, to the prevailing party unless a voluntary dismissal is filed or the pleadings are amended as to any nonjusticiable issue within a reasonable time after the attorney or party filing the dismissal or the amended pleadings knew, or reasonably should have known, that he would not prevail.

Subsection (b) of this statute sets forth what is required to find that an issue is nonjusticiable:

> In order to find an action, claim, setoff, counterclaim, or defense to be lacking a justiciable issue of law or fact, the court must find that the action, claim, setoff, counterclaim, or defense was commenced, used, or continued in bad faith solely for purposes of harassing or maliciously injuring another or delaying adjudication without just cause or that the party or the party's attorney knew, or should have known, that the action, claim, setoff, counterclaim, or defense was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification, or reversal of existing law.

Subsection (d) provides, "On appeal, the question as to whether there was a complete absence of a justiciable issue shall be determined de novo on the record of the trial court alone." See also *Drummond v. Shepherd*, 97 Ark. App. 244, 247 S.W.3d 526 (2007).

■ Here, it was Adams's confirmed actions that motivated appellees to file their lawsuit. For no apparent reason, Adams told Vickers that he was going to have a survey performed, and it was ostensibly agreed that the parties would be bound by the survey. When Leonard Adams did not agree with the property line

established by the Higby survey, he erected fenceposts at night on what he asserted to be the property line, knowing that two earlier surveys, together with the Higby survey that Adams himself commissioned, all confirmed that where he placed the fenceposts was not the property line. There is no evidence in the record, other than Adams's bare, unfounded assertion, that the boundary line established and confirmed by all of the surveys was not in fact the boundary line. Section 16-22-309 applies with equal force against the losing party whether it is an "action, claim, setoff, counterclaim, or defense." From this record, on de novo review, we hold that there was a complete absence of a justiciable issue on Adams's part in his defense. We reverse and remand this issue to the trial court for determination of the appropriate award of attorney's fees.

■ Although none of the parties mention it, there is a remaining issue in that the order did not establish the boundary line by specific description. In *Jennings v. Burford*, 60 Ark. App. 27, 958 S.W.2d 12 (1997), when the trial court's decree described the boundary line as "the meandering fence reflected by the Askew survey," this court granted leave to the trial court to amend the decree by adding a more specific legal description of the boundary line reflected by the Askew survey and affirmed the case as modified. In the present case, the trial court found that the boundary line of the Higby survey was the true and correct boundary between the parties' respective properties. We therefore grant the trial court leave to amend the decree by adding the specific legal description contained in the Higby survey so that the boundary line is established by specific description.

Affirmed in part; reversed and remanded in part; leave granted to the trial court to amend the decree so that the boundary is established by specific description.

ROBBINS and MILLER, JJ., agree.